AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

11/30/2020

for the

DM

Central District of California

United States of America

v.

JESUS FRANCISCO HERNANDEZ,
ANTONIO YANEZ, and
JUSTIN ARTEAGA,

Defendants

Case No.  2:20-mj-05824

```
FILED
CLERK, U.S. DISTRICT COURT

Nov 30 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ib___  DEPUTY
```

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of November 13, 2020 in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1959(a)(1), (2)(a) | Violent Crime in Aid of Racketeering; Aiding and Abetting |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Manuel J. Aguirre*
Complainant's signature

Manuel J. Aguirre, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Civ. P. 4.1 by telephone.

Date:  11/30/2020

City and state:  Los Angeles, California

Judge's signature

Hon. Alexander MacKinnon, U.S. Magistrate Judge
Printed name and title

## **Table of Contents**

I.    INTRODUCTION..........................................2

II.   PURPOSE OF AFFIDAVIT..................................3

III.  PROPERTY TO BE SEARCHED...............................4

IV.   ITEMS TO BE SEIZED....................................4

V.    STATEMENT OF PROBABLE CAUSE...........................5

      A.    Summary of Probable Cause.......................5

      B.    Background on G13, the Enterprise...............5

      C.    G. Hernandez, J. HERNANDEZ, YANEZ, and ARTEAGA
            are G13 Members.................................8

      D.    There is Probable Cause that J. HERNANDEZ, YANEZ,
            and ARTEAGA Committed the COMPLAINT OFFENSES....10

            1.    November 13, 2020 Murder of E.C...........10

            2.    Murder Investigation......................13

            3.    ARTEAGA's Mirandized Confession...........16

      E.    There is Probable Cause to Believe the Murder of
            E.C. Was Committed to Increase or Maintain
            Position in G13.................................20

      F.    There is Probable Cause that Evidence of the
            SEARCH WARRANT OFFENSES Will be Found at the
            SUBJECT PREMISES................................21

VI.   CONCLUSION...........................................26

VII.  SEARCH PROCEDURE FOR DIGITAL DEVICES.................v

## AFFIDAVIT

I, Manuel J. Aguirre, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since September 2015. Prior to becoming a SA with HSI, I was an agent with the United States Border Patrol for approximately 19 years. I have graduated from multiple academy classes conducted at the Federal Law Enforcement Training Centers, most recently the Homeland Security Investigations Special Agent Training Program ("HSISAT") as well as completing the Criminal Investigator Training Program ("CITP").

2. I was previously assigned to a narcotics task force and I am currently assigned to the HSI Los Angeles Gangs Group. This unit is specifically tasked with investigations targeting individuals and organizations involved in illicit criminal street gang activities/criminal enterprises related to extortion, murder, firearms and the importation and exportation of controlled substances and firearms as well all other forms of conspiracies associated with these offenses. I have personally participated in numerous investigations related to all of the aforementioned programmatic areas within HSI.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.    This affidavit is made in support of a criminal complaint against, and arrest warrants for, Jesus Francisco HERNANDEZ, also known as ("aka") "Rowdy" ("J. HERNANDEZ"), Antonio YANEZ, aka "Tank" ("YANEZ"), and Justin ARTEAGA, aka "Hitta" ("ARTEAGA") for violations of 18 U.S.C. § 1959(a)(1) (Violent Crime in Aid of Racketeering) and 18 U.S.C. § 2 (Aiding and Abetting) ("COMPLAINT OFFENSES").  This affidavit is also made in support of search warrants for the SUBJECT PREMISES, as detailed herein and described in Attachments A-1 through A-3, for the items to be seized as described in Attachment B. Attachments A-1 through A-3 and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrant and complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>PROPERTY TO BE SEARCHED</u>

5.    This affidavit is made in support of search warrants for the following SUBJECT PREMISES:

a.    <u>SUBJECT PREMISES 1</u>.  George Hernandez's ("G. Hernandez") residence, located at 1222 W. 144th St., Apartment 2, Gardena, California 90247 ("SUBJECT PREMISES 1"), as described in Attachment A-1, for the items to be seized described in Attachment B;

b.    <u>SUBJECT PREMISES 2</u>.  J. HERNANDEZ's residence, located at 1152 W. Marine Ave., Apartment 10, Gardena, California 90247 ("SUBJECT PREMISES 2"), as described in Attachment A-2, for the items to be seized described in Attachment B;

c.    <u>SUBJECT PREMISES 3</u>.  ARTEAGA's residence located at 1070 W. 134th Pl., Gardena, California 90247 ("SUBJECT PREMISES 3"), as described in Attachment A-3, for the items to be seized described in Attachment B, (collectively, "the SUBJECT PREMISES").

### IV. <u>ITEMS TO BE SEIZED</u>

6.    I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of 18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt Organizations ("RICO") Conspiracy); 18 U.S.C. § 1959 (Violent Crime in Aid of Racketeering); 18 U.S.C.

4

§§ 924(c)(1)(A)(ii), (iii), (j)(1) (Use and Carry a Firearm During and in Relation to, Possess and Discharge a Firearm in Furtherance of, a Crime of Violence, Resulting in Death); and 18 U.S.C.§ 922(g) (Felon in Possession) (collectively, the "SEARCH OFFENSES") will be found in the SUBJECT PREMISES.

## V.  STATEMENT OF PROBABLE CAUSE

### A.   Summary of Probable Cause

7.   On November 13, 2020, Gardena 13 ("G13") gang members G. Hernandez, J. HERNANDEZ, YANEZ, and ARTEAGA murdered E.C. just outside his family's home in Gardena, California, located within territory controlled by G13, and committed the murder for the purpose of maintaining and increasing their respective positions within G13, an enterprise engaged in racketeering activity.

### B.   Background on G13, the Enterprise[1]

8.   G13, including its leaders, members, and associates, is an enterprise as defined in 18 U.S.C. § 1961(4), engaged in a pattern of racketeering activity, such as murder, and is described as follows:

a.   Gardena Trece or Gardena 13 ("G13") is a violent criminal street gang which originated in and has a strong base

---

[1]  The background information on G13 contained in this paragraph is based on my background, training, and experience, as well as interviews with witnesses, cooperating defendants, informants, and suspects, and communication with other law enforcement officers.

of operations in Gardena, California.  G13 claims territory between 135th Street on the north side, 190th Street on the south side, Crenshaw Blvd. to the west, and Main St. in Gardena, California to the east.  G13 is primarily a Latino street gang.[2] G13 gang members are involved with various violent crimes including murder, attempted murder, assaults, extortion, narcotics trafficking, robbery, burglary, vehicle theft, and human smuggling, as well as money laundering.  The gang has over 300 members, who are inducted, or "jumped in," by fellow gang members and by putting in "work," such as shooting and robberies on behalf of the gang.  Many G13 gang members are connected through familial relationships.

        b.   G-13 is controlled by members and associates of the "Mexican Mafia," or "La Eme."  The Mexican Mafia is an organized group of individuals who controls much of the drug distribution and other criminal activities within California State Prisons, local county jails, and some federal prisons. Members of the Mexican Mafia come from the ranks of local street gangs, including the G13 Gang.  In return for allowing local street gangs to maintain control over their territories and for

---

[2]   In approximately December 2010, the Western District of Texas charged eight members of G13 with a narcotics related conspiracy.  See United States v. Tapia, et al., CR 10-297 (W.D. Tex. 2010).  The conspiracy involved, among other things, the transportation of large quantities of methamphetamine, hidden inside vehicles, from Southern California to Texas.  At trial, two co-defendants cooperated with the government and testified.

protecting the gangs' members and associates during periods of incarceration, the Mexican Mafia requires the gangs to collect and pay "taxes" on drug trafficking and other illicit and illegal conduct taking place in those territories (hereinafter, "extortionate taxes").  These illicit funds are intended to be controlled by, and are often held in trust by, gang members and associates for the Mexican Mafia member(s) in charge of a particular area.  Members and associates of the G13 Gang regularly pay extortionate taxes to the Mexican Mafia members who oversee the gang; and the collection of extortionate taxes from drug dealers operating within the G13 Gang's territory is a primary task of the gang's leadership on the streets, as is punishing individuals who fail to pay the requisite extortionate taxes.

      c.   Gardena 13 currently has documented membership in California, Nevada, Texas, Hawaii and Rosarito, Mexico.  Law enforcement, namely, the Gardena Police Department, believes that G13 traffics primarily in methamphetamine and currently supply members in Hawaii with Methamphetamine, through body carriers and express courier parcels.  Law Enforcement further believes that G13 is obtaining "Ghost Guns" from the Las Vegas, Nevada area.

**C.   G. Hernandez, J. HERNANDEZ, YANEZ, and ARTEAGA are G13 Members**

9.   Based on my training and experience, and conversations with other law enforcement officers and agents, as well as my familiarity and personal involvement with this investigation, I am aware of the following:

a.   Based on the following, I know that G. Hernandez was a G13 gang member:

i.   G. Hernandez is the older brother of J. HERNANDEZ and was a long-time documented G13 member.  G. Hernandez had extensive prior contacts with the Gardena Police Department ("Gardena PD"), is known to associate with other G13 gang members, was believed to be a Mexican Mafia associate, and had numerous G13 related tattoos.[3]

b.   Based on the following, I know that J. HERNANDEZ is a G13 gang member:

i.   Gardena PD has had several prior contacts with J. HERNANDEZ, who is a self-admitted G13 gang member and known to associate with other G13 gang members.  J. HERNANDEZ has been documented as a G13 gang member by Gardena PD during field interviews and is known to Gardena PD as a G13 gang member.  According to Gardena PD, it is common to see his moniker spray-painted, or "tagged," on walls, often along with

---

[3]   G. Hernandez passed away while in the hospital as a result of wounds suffered during the course of the shooting incident on November 13, 2020.

the moniker of fellow G13 gang member, YANEZ.  His moniker, "Rowdy," has been spray painted in graffiti on the fence of E.C.'s residence and was there on the night of the shooting.

        c.   Based on the following, I know that YANEZ is a G13 gang member:

        i.   Gardena PD has had several prior contacts with YANEZ, who is a self-admitted G13 gang member and known to associate with other G13 gang members.  YANEZ has been documented as a G13 gang member by Gardena PD during field interviews and is known to Gardena PD as a G13 gang member.  YANEZ has gang-related tattoos, including a "G13" on his stomach.  According to Gardena PD, it is common to see his moniker tagged on walls, often with the moniker of J. HERNANDEZ.  His moniker, "Tank," has previously been spray painted in graffiti on the fence of E.C.'s residence and was present on the night of the shooting.

        d.   Based on the following, I know that ARTEAGA is a G13 gang member:

        i.   Gardena PD has had several prior contacts with ARTEAGA, who known to associate with other G13 gang members.  ARTEAGA has been documented as a G13 gang member by Gardena PD during field interviews and is known to Gardena PD as a G13 gang member.  ARTEAGA has been arrested for G13 gang-related graffiti, documented wearing G13 gang apparel, and has a

gang-related tattoo of an "HA" on his left forearm.  HA stands for Harbor Area and G13 falls within the Harbor Area umbrella for Southern Hispanic gangs.  While ARTEAGA denies membership in G13, and claims to only associate with other G13 members, he has admitted that his moniker is "Hitta."  During his post-arrest interview, ARTEAGA further admitted that on November 13, 2020, just prior to the shooting, G. Hernandez asked ARTEAGA to accompany him to confront E.C.  According to ARTEAGA, he had to back up G. Hernandez or face discipline by the gang.  Moreover, at the time of his arrest, ARTEAGA was in possession of a Green Bay Packers windbreaker, which I know, based on my training and experience, is associated with G13, namely, the distinctive "G" on the windbreaker for G13.

**D. There is Probable Cause that J. HERNANDEZ, YANEZ, and ARTEAGA Committed the COMPLAINT OFFENSES**

1.  November 13, 2020 Murder of E.C.[4]

10.  On the evening of Friday, November 13, 2020, W.C. and his brother, victim E.C. were seated in E.C.'s car parked near the driveway of their home on Raymond Ave.[5]  E.C. sat in the driver's seat and W.C. sat in the passenger's seat.

---

[4]  The information about the facts of the murder is based on law enforcement's interviews with witnesses, my review of surveillance footage, collection of physical evidence, and the interview of ARTEAGA.

[5]  The residence is located at the corner of 144th Place and Raymond Ave., with an address of 1247 W. 144th Place.

11.   At approximately 9:45 p.m. while seated in E.C.'s car W.C. and E.C. saw three Hispanic men walking toward them – one in the middle and each side of the street.   These three men were later identified as G. Hernandez, YANEZ, and ARTEAGA.

12.   E.C. turned his car's headlights on to see G. Hernandez, YANEZ, and ARTEAGA as they approached.   As they came closer, the man in the middle of the street (wearing black clothes) began displaying gang signs, while one of the other men asked, "what's your problem?  What are you doing here?" to which E.C. and W.C. replied, "we live here.  We live right here."

13.   E.C. stepped out of his car and stood in the wedge between his car door and the driver's seat of the car.

14.   One of the three men said, "this is our hood," and another said, "This is my hood."  W.C. stated, "look, we live here.  We don't gangbang.  We mind our own business.  We stay over here.  Ya'll go back around to that corner."  W.C. also stated, "this is our neighborhood.  We've been here 15 years." G. Hernandez stated in response, "I've been here 33 years.  This is my hood."  As the conflict began to escalate, W.C. texted their father, L.C., who was inside the family home at the time, and asked him to bring his gun outside because of the escalating conflict between E.C. and G. Hernandez, YANEZ, and ARTEAGA.

15.   Following this exchange, G. Hernandez, YANEZ, and ARTEAGA began arguing with E.C., who kept repeating that the

11

brothers lived at the house and for the men to keep their business on their side of the block.

16.   G. Hernandez continued arguing with E.C. and, ultimately, swung at E.C. as E.C. stood next to his car.   E.C. swung back at G. Hernandez.   At around the same time, W.C. saw all three men pull out guns.[6]

17.   L.C. was inside the family's home when he received a text message from his son, W.C., asking him to bring his gun outside, to which L.C. responded by telling his son to go inside his residence.   L.C. then heard gunshots after which he grabbed his firearm and ran outside as his son, W.C., was running into the residence and told him "they're shooting E.C."   While inside the house, W.C. heard approximately 15-20 gunshots.

18.   When he got outside, L.C. saw G. Hernandez stopped on the corner of Raymond Ave. and 144th St., approximately 50 yards from the driveway of his house and where E.C.'s car was parked. G. Hernandez pointed his firearm at L.C. and began shooting. L.C. returned fire, hitting G. Hernandez.   Shortly thereafter, L.C. saw a second person at the same corner, bending over to apparently drag G. Hernandez away.   This second person began firing at L.C. and L.C. returned fire.   L.C. then went to where his son, E.C., was lying.   Ultimately, it was determined that

---

[6]   Based on a review of the security camera footage, I believe that all three men, G. Hernandez, YANEZ, and ARTEAGA drew their weapons as they walked up to E.C. and W.C.

E.C. had approximately 10 gunshot wounds to his arm, back, sides, chest, and stomach.

        2.   <u>Murder Investigation</u>

19.  At approximately 9:47 p.m., pursuant to a 911 call of multiple gunshots, law enforcement responded to the 1200 block of 144th Street.  As law enforcement arrived, L.C. flagged them down and explained that his son had been shot.  Casings and a magazine were laying on the ground approximately two feet from E.C.  Law enforcement, and then paramedics, performed CPR on E.C., but he was pronounced dead at 10:08 p.m. that night.

20.  G. Hernandez was lying on the street in front of 1242 W. 144th Street, with gunshot wounds to his head and chest.  G. Hernandez was subsequently taken by ambulance to the hospital.  On or about November 23, 2020, G. Hernandez succumbed to his injuries.

21.  After law enforcement secured the crime scene surrounding the shooting of E.C., a resident in the area reported that a male Hispanic man was jumping fences behind 1239 W. 144th Place.

22.  Shortly thereafter, law enforcement located YANEZ and J. HERNANDEZ in the backyard of 1238 W. 144th St.  At the time he was located, J. HERNANDEZ was wearing a black sweatshirt and trying to conceal himself behind some lawn furniture and trashcans.  As J. HERNANDEZ was being handcuffed, officers

13

noticed that YANEZ also hiding in the backyard.  YANEZ was
wearing a grey sweatshirt and his hands and clothes were covered
in blood.

23.  After YANEZ and J. HERNANDEZ were detained, Gardena PD
conducted a field show-up with W.C.  After admonishing W.C. that
the detained individuals may or may not be involved, W.C., from
approximately 15 yards away, identified both YANEZ and J.
HERNANDEZ as two of the men involved in the shooting.

24.  Law enforcement canvassed the area for evidence.
Along the east side of 1242 W. 144th Street, around the corner
from the crime scene, law enforcement recovered an unlocked
wooden box.  The wooden box was located just yards from the
location at which G. Hernandez, J. HERNANDEZ, ARTEAGA, and YANEZ
were standing as E.C. and W.C. drove by, just prior to the
shooting.  Inside the box were several firearms including:

i.   An empty black Polymer semi-automatic 9mm,
with no serial number, equipped with a tactical light and a
copper colored threaded barrel;

ii.  A Black Polymer semi-auto 9mm, with no
serial number, model PF940C, equipped with a high-capacity
magazine;

iii. A loaded Black Polymer semi-automatic 9mm
handgun, with no serial number, model PF940C; and

iv.   A Black Remington 9mm Lugar+P, serial number 0013879R51.

25.   On November 16, 2020, detectives assigned to Gardena PD's Special Enforcement Unit ("SEU"), who are familiar with G13 and have had several contacts with many of its members, reviewed the video surveillance footage obtained from nearby residences, which captured portions of the shooting on November 13, 2020. Prior to reviewing the video, the SEU detectives were made aware that G. Hernandez, J. HERNANDEZ, and YANEZ had been identified at the scene as being involved in the shooting death of E.C.

26.   Upon viewing the video, the SEU detectives identified G. Hernandez, J. HERNANDEZ, YANEZ, and ARTEAGA as those hanging out in a driveway around the corner from E.C.'s residence just before the shooting.  Based on the video, however, it appears that J. HERNANDEZ remained in the driveway during the initial confrontation with E.C. and W.C.  As E.C.'s car is seen driving past the driveway where the G13 members had been hanging around, G. Hernandez, YANEZ, and ARTEAGA walked in the direction of E.C.'s residence.

27.   After shooting E.C., G. Hernandez, YANEZ, and ARTEAGA fled to the corner of 144th St and Raymond Ave.  Following the initial confrontation between E.C. and G. Hernandez, YANEZ, and ARTEAGA, the video shows J. HERNANDEZ joining in as the confrontation with L.C. begins.  J. HERNANDEZ was wearing a

15

sweater with a possible red sleeve and blue sleeve, appearing to
hold a gun, and going off the camera screen with his arm
extended towards L.C.

28.  ARTEAGA was identified in the video as the individual
wearing a gray hooded sweater, holding a gun and firing it,
though appearing to have some difficulty shooting his gun.  Upon
closer examination, and despite him wearing a hat and COVID
facemask, SEU detectives recognized this man as ARTEAGA based on
his build, stature, movement, and side profile.

### 3.   ARTEAGA's Mirandized Confession

29.  On November 17, 2020, at approximately 1:00 p.m., HSI
queried its TECS database and determined that ARTEAGA was booked
on a flight departing LAX to Guadalajara, Jalisco, Mexico at
2:55 p.m. that day.  HSI agents responded to LAX and detained
ARTEAGA, who had an outstanding arrest warrant for a vandalism
charge.  At the time of his arrest, ARTEAGA appeared to be
wearing the same hat worn in the video of the shooting incident
on November 13, 2020.  ARTEAGA was transported to the Gardena PD
jail.

30.  On November 17, 2020, Gardena PD detectives
interviewed ARTEAGA.  ARTEAGA was advised of his Miranda Rights,
confirmed his understanding of his rights, and agreed to speak
with law enforcement.  During his interview, ARTEAGA explained
that on the day of the shooting, he was standing around when a

car drove by that was playing its music loudly and the occupants of the car made disrespectful comments, saying, "what the fuck you looking at?"  G. Hernandez requested backup so that he did not enter a confrontation alone.[7]  Ultimately, ARTEAGA explained that he proceeded to E.C.'s car with a total of 3 to 4 others, all of whom had guns.

31.  When asked who went to get the guns, ARTEAGA stated, "Me and Rowdy [J. HERNANDEZ]."  When asked where the guns had come from, ARTEAGA stated that they got them "In the cut . . . around the house."  Based on my training and experience, I am aware that "the Cut" is street slang for a safe place to hide and, as mentioned above, four firearms were found in a makeshift box within the crime scene.

32.  According to ARTEAGA, G. Hernandez and E.C. began arguing with one another until E.C. got out of his car and began to fight with G. Hernandez.  ARTEAGA said he was in shock, began to panic, and fired his gun.  ARTEAGA stated that he fired three shots, G. Hernandez "maybe" fired his gun, and that the others fired their guns as well.  ARTEAGA described the gun he used as

---

[7]  A review of the security camera footage obtained from a nearby residence appears to show E.C.'s car drive by the location at which the G-13 members were standing around and then, just before the shooting, on its way back to E.C.'s family residence.  As the car appears to pass the G13 members in the first instance, the passenger side window appears to be up, and as the car returned past the G13 gang members, the driver's side window appears to be up.

lacking a light or long extended magazine, and "just plain, plain black."

33.  ARTEAGA also explained that he and "Tank" (YANEZ) tried to drag G. Hernandez along the street as someone tried to shoot at them.  When confronted with the number of bullet casings located where G. Hernandez was found, and the unlikelihood that there would be so many casing if he and YANEZ had only been receiving gunfire, ARTEAGA admitted that "maybe" he and YANEZ had fired their guns.  ARTEAGA claimed to only have fired "maybe like 1, 2" shots in the air.  Asked if anyone else fired, ARTEAGA said he believed the guy with the "fourth gun" had fired his weapon.  Asked if that was a reference to J. HERNANDEZ, ARTEAGA stated, "I think, I don't know if that was him though."

34.  When asked where J. HERNANDEZ had been prior to the shooting, ARTEAGA stated that he did not know and that he came out of nowhere.  When asked specifically which three men walked up to E.C.'s car, ARTEAGA replied "Me and Vamp [G. HERNANDEZ] and I guess the other fool [YANEZ]."

35.  The following is G. Hernandez's relevant criminal history:

| DATE | TYPE | VIOLATION | SENTENCE |
|------|------|-----------|----------|
| May 2009 | Felony | Robbery, in violation of California Penal Code § 211 | 11 years' prison |

18

36.   The following is YANEZ's criminal history.  In addition to the instant conduct, YANEZ was arrested for murder in August 2020, but the charges were dismissed.

| DATE | TYPE | VIOLATION | SENTENCE |
|------|------|-----------|----------|
| Mar. 2017 | Felony | Taking Vehicle Without Owner's Consent, in violation California Vehicle Code §10851(A) | 2 years' prison |
| Mar. 2017 | Felony | Second Degree Robbery, in California Penal Code §211 | 3 years' prison |

37.   The following is J. HERNANDEZ's (aka "Rowdy") relevant criminal history.  In addition to the instant conduct, J. HERNANDEZ was arrested for murder in August 2017, but the charges were dismissed.

| DATE | TYPE | VIOLATION | SENTENCE |
|------|------|-----------|----------|
| Feb. 2014 | Misd. | Obstruction of a Public Officer, in violation California Penal Code §184(A)(1) | 36 months' probation |
| Feb. 2016 | Felony | Carrying A Loaded Firearm In Public, in violation of California Penal Code § 25850(A) | 210 days county jail |
| March 2019 | Felony | Vandalism, in violation of California Penal Code § 594(A) | 1 year |

38.   ARTEAGA has no criminal convictions, but has multiple arrests, including for murder in August 2020.

19

**E.   There is Probable Cause to Believe the Murder of E.C. Was Committed to Increase or Maintain Position in G13**

39.   G13 is a long-standing criminal street gang of which G. Hernandez, J. HERNANDEZ, YANEZ, and ARTEAGA are members.

40.   The murder of E.C. occurred in the heart of G13 territory.  This is significant because this particular location is close to where many G13 gang members live.  G13 uses violence in order to protect their neighborhood and territory.[8]  Indeed, 144th Street, the location of the murder, is referred to as "the Four Block" by G13 members because it is such a common location for G13 to congregate.  The particular location where G. Hernandez, J. HERNANDEZ, YANEZ, and ARTEAGA were standing prior to the shooting, just around the corner from E.C.'s family residence, is replete with G13 gang graffiti, including the monikers of G. Hernandez, J. HERNANDEZ, and YANEZ, and was only several yards from where the stash of firearms was recovered.

41.   G13 graffiti, including the monikers for G. Hernandez, J. HERNANDEZ, and YANEZ, along with other G13 members, has been sprayed on E.C.'s residence and in the immediate area of the residence, including where G. Hernandez, J. HERNANDEZ, YANEZ, and ARTEAGA were standing as E.C.'s car drove by.  This is significant because G13 uses graffiti to mark their territory,

---

[8]   The location at which E.C. was murdered is approximately .1 miles from SUBJECT PREMISES 1, .7 miles from SUBJECT PREMISES 2, and .9 miles from SUBJECT PREMISES 3 – the residence of G. Hernandez, J. HERNANDEZ, and ARTEAGA, respectively.

inform residents and rivals what territory is claimed by G13, and as a form of intimidation for the community and rival gang members.

42.   During the initial confrontation, G. Hernandez, YANEZ, and ARTEAGA all told E.C. and W.C. that "this" was their neighborhood.  This is significant because E.C. and W.C's family home is in the heart of G13 territory, and around the corner from the location at which G. Hernandez, J. HERNANDEZ, YANEZ, and ARTEAGA appeared to have stored their firearms, as well as the location which they often congregate and mark with gang graffiti.

43.   During ARTEAGA's interview, ARTEAGA admitted that he participated to backup G. Hernandez, who he perceived to have been disrespected.  Based on my knowledge of G13, as well as my training and experience, I know that respect is essential to maintaining and building reputation with a gang such as G13. When a gang and/or individual gang members are feared and/or respected, it allows members to commit crimes with impunity. Indeed, ARTEAGA stated during his interview that he had to back up the "big homie" (G. Hernandez) and that if had refused, then he would have been disciplined.  For all of these reasons, there is probable cause to believe that the murder of E.C. was committed to maintain and increase G. Hernandez's, J. HERNANDEZ's, YANEZ's, and ARTEAGA's positions within G13.  Based

on the foregoing there is probable cause to believe that G. Hernandez, J. HERNANDEZ, YANEZ, and ARTEAGA, for the purpose of maintaining and increasing their position in the G13 enterprise, an enterprise engaged in racketeering activity, murdered E.C., in violation in California Penal Code § 187.

**F.   There is Probable Cause that Evidence of the SEARCH WARRANT OFFENSES Will be Found at the SUBJECT PREMISES**

44.   On September 1, 2020, the Gardena P.D. and Los Angeles County Sheriff's Department conducted a parole search at SUBJECT PREMISES 1 because it was documented as G. Hernandez's residence with the Los Angeles County Probation Department.  On the date of the search, G. Hernandez was not present.

45.   On November 14, 2020, J. HERNANDEZ provided SUBJECT PREMISES 2 as his address to law enforcement.  The Los Angeles County Probation Office has also used the address of SUBJECT PREMISES 2 for probation compliance checks as recently as September 1, 2020.

46.   On November 17, 2020, ARTEAGA provided the address associated with SUBJECT PREMISES 3 to law enforcement as part of the instant investigation.

47.   Based on my background, training, and experience, as well as conversations with other law enforcement personnel and my familiarity with this investigation, I believe there is probable cause that evidence of the SEARCH OFFENSES will be

found at the SUBJECT PREMISES.  In particular, I am aware of the following:

        a.  I know that gang members often store or maintain items associated with their gang affiliation in their residences, to include photographs, scrapbooks, images of graffiti associated with their gang, other objects displaying allegiance to their gang, including posters, drawings, hats or other apparel bearing gang signs and symbols, rosters, monikers, telephone numbers, and sometimes detailed notes about discipline, debts owed, gang members who are not in good standing, rent collection, and rent payments at their residences.

        b.  Additionally, based on my background, training, experience, and knowledge of this investigation, including searches of locations and recovery of digital evidence, including cellular telephones, I know that G13 members frequently communicate with each other via digital devices, including cellular telephones.  Based on my knowledge of this investigation, I know that G13 members communicate, via voice calls and text messages, about, among other things, extortionate rent payments, narcotics and firearms transactions, members in bad standing, planned or upcoming discipline of G13 members, and crimes committed by or against G13 members.  I am aware that law enforcement has seized numerous cellular telephones from G13

gang members, most of which contained some combination of photographs of G13 members throwing hand signs, G13 graffiti, and/or G13 imagery.

48. Based upon my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between

persons buying and selling firearms often occurs over phone
calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular
phones and other digital devices as they frequently send these
photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

        d.    Individuals engaged in the illegal purchase or
sale of firearms and other contraband often use multiple digital
devices.

## VI. <u>CONCLUSION</u>

49.  For all the reasons described above, there is probable cause to believe that J. HERNANDEZ, YANEZ, and ARTEAGA committed the COMPLAINT OFFENSES and that probable cause exists to search the SUBJECT PREMISES for evidence, fruits, and instrumentalities of the SEARCH OFFENSES.

/ S / _____

Manuel J. Aguirre, Special
Agent, Homeland Security
Investigations

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>30th</u> day of
November, 2020.

_____

ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

     The premises to be searched is the parcel located on 1222 W. 144th St., Apartment 2, Gardena, California 90247 ("SUBJECT PREMISES 1"). SUBJECT PREMISES 1 is an apartment unit located within a multi-unit apartment complex. The number "1222" is posted on the front of the building on a brown post. SUBJECT PREMISES 1's door is located on the first floor of the apartment building. The front door of SUBJECT PREMISES 1 faces east. The apartment complex within which SUBJECT PREMISES 1 is located shares a parking lot with an another multi-unit apartment complex. The parking spaces associated with the apartment complex in which SUBJECT PREMISES 1 is located are those on the western side of the parking lot. SUBJECT PREMISES 1 includes any parking spaces, garages, storage spaces, and appurtenances that are associated with the property located at 1222 W. 144th St., Apartment 2, Gardena, California 90247.

### ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The premises to be searched is the parcel located on 1152 W. Marine Ave., Apartment 10, Gardena, California 90247 ("SUBJECT PREMISES 2").  SUBJECT PREMISES 2 is an apartment unit located within a multi-unit apartment building.  The apartment building in which SUBJECT PREMISES 2 is located is a cream colored multi-unit apartment complex.  The number "1152" is located in large brown letters on the top of the building. SUBJECT PREMISES 2 is located on the second floor of the apartment building and must be accessed through the a set of stairs.  SUBJECT PREMISES 2 includes any parking spaces, garages, storage spaces, and appurtenances that are associated with the property located at 1152 W. Marine Ave., Apartment 10, Gardena, California 90247.

## ATTACHMENT A-3

PROPERTY TO BE SEARCHED

    The premises to be searched is the parcel located on 1070 W. 134th Pl., Gardena, California 90247 ("SUBJECT PREMISES 3"). SUBJECT PREMISES 3 is a one-story, tan house, with white-trim around its windows, and a cement pathway leading to its front door.  The number "1070" is located in black lettering on a white post above the mailbox.  SUBJECT PREMISES 3 has a small porch, with the front door facing west and has a black security gate on it on the front door.  SUBJECT PREMISES 3 has a garage at the rear of the property.  The garage door leads to an alley located south of SUBJECT PREMISES 3 and can also be accessed through 135th Street.  The garage door has the number "1070" on the top of the garage door.  SUBJECT PREMISES 3 includes any parking spaces, garages, storage spaces, and appurtenances that are associated with the property located at 1070 W. 134th Pl., Gardena, California 90247.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, fruits, and
instrumentalities of violations of 18 U.S.C. § 1962(d)
(Racketeer Influenced and Corrupt Organizations ("RICO")
Conspiracy); 18 U.S.C. § 1959 (Violent Crime in Aid of
Racketeering); 18 U.S.C. §§ 924(c)(1)(A)(ii), (iii), (j)(1) (Use
and Carry a Firearm During and in Relation to, and Possess a
Firearm in Furtherance of, a Crime of Violence, Resulting in
Death); and 18 U.S.C. § 922(g) (Felon in Possession), namely:

     a.   Firearms and ammunition;

     b.   Documents or other items showing occupancy,
ownership, or rental of the SUBJECT PREMISES identified on the
search warrant, including addressed envelopes, utility bills,
telephone bills, rent receipts, keys, or items with labeled or
personalized names;

     c.   Photographs, scrapbooks, images of graffiti
associated with G-13 or the Mexican Mafia;

     d.   Posters, drawings, hats or other apparel bearing
G13 signs and symbols;

     e.   Rosters, monikers, and telephone numbers for G13
members;

     f.   Notes or papers containing information about
discipline as to an G13 member, debts owed by G13 members, G13

1

members who are not in good standing, rent collection, and rent payments; and

       g.   Documents, photographs, conversations, texts, messages evidencing:

          i.   Murders, attempted murders, or conspiracies to commit murders by G13 members;

          ii.  The sale and trafficking of illegal drugs and their proceeds;

          iii. G13

          iv.  Recruitment of new G13 members;

          v.   Collection and payment of rent;

          vi.  Notes or papers containing information about discipline as to a G13 member, debts owed by G13 members, G13 members who are not in good standing, rent collection, and rent payments;

       h.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SEARCH OFFENSES, and forensic copies thereof.

       i.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

          i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries,

configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser

history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## VII. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may

retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the SEARCH OFFENSES listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

8

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress Jesus HERNANDEZ's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Jesus HERNANDEZ's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.